1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DANNY LASHAWN HAMPTON

11              Petitioner,              No.  2:  11-cv-0541 WBS DAD P

12      vs.

13   M. D. McDONALD,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17              Petitioner is a state prisoner proceeding *pro se* with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a Sacramento County

19   Superior Court jury of first degree murder and two counts of robbery.  The jury also found true

20   the allegation that the murder was committed in the commission of a robbery, that the robberies

21   were committed in concert in an inhabited dwelling and that a principal was armed with a firearm

22   as to all counts.  Petitioner received a sentence of thirty-three years to life imprisonment.

23   Petitioner raises three claims in this federal habeas petition; specifically:  (1) ineffective

24   assistance of counsel ("Claim I"); (2) ineffective assistance of appellate counsel ("Claim II"); and

25   (3) his constitutional right were violated because the "trial judge's actions and words inflamed

26   /////

1

1  the jury forming a preconceived prejudice" (Am. Pet. at p. 5) ("Claim III").  For the following

2  reasons, petitioner's application for federal habeas relief should be denied.

3  II.  FACTUAL BACKGROUND

4       Defendant and codefendants formed and carried out a plan to rob
     defendant's marijuana dealer, Larry Elliott, on the night of
5       December 9, 2004.  Knowing that Elliott did business out of the
     attached garage of his house, they intended to perpetrate the crime
6       there.  Before they left Elliott's house that night, he had not only
     been robbed but fatally shot in the garage; his girlfriend, H.M. was
7       robbed inside the house.  The evidence tended to show that
     defendant did not personally perpetrate either the murder of Elliott
8       or the robbery of H.M.

9       Defendant did not testify at trial.  He gave his version of events in a
     taped interview with police, which was played for the jury.

10

11  *Defendant's Account*

12       Codefendants Quintanilla and Scott, who knew defendant, saw him
     and his girlfriend getting a ride home from Elliott.  Knowing that
13       Elliott sold marijuana, they followed Elliott to defendant's house,
     then to Elliott's house, then they returned to defendant's house,
14       where codefendant Doughton was present.  The four men discussed
     robbing Elliott.  Defendant originally said he did not want to be a
15       part of it, but the others told him that since he had heard the
     conversation, he had no choice.  Defendant was to buy an ounce of
16       marijuana from Elliott as a pretext to scout out how much he had at
     his house; as defendant understood it, that would end his
17       involvement, and the other would do the robbery another night.
     Defendant called Elliott and set up the pretext buy.  Quintanilla and
18       Scott changed into black clothing.

19       Defendant and Doughton walked over to Elliott's house.  [FN
     5]  Defendant and Doughton went into Elliott's garage, where
20       Elliott offered defendant a sample of marijuana.  Two guests of
     Elliott, James Willis (whom defendant knew) and George Porter,
21       were also in the garage.

22            [FN 5] Quintanilla's girlfriend, K.T., testified that
          she drove Quintanilla to a park near Elliott's house;
23            Scott, with defendant and Doughton, pulled up
          alongside.  Defendant said he would call Elliott and
24            then call the others if Elliott was home.  Several
          minutes later, Quintanella [sic] got the call and he
25            and Scott left.  Fifteen or 20 minutes after that, they
          all ran back to the car.

26

2

Quintanilla and Scott, dressed in black clothes and ski masks, burst in.  Quintanilla had a gun and gave defendant another.  Quintanilla ordered Elliott and his guests onto the ground and told defendant to turn on the radio.  Quintanilla then took his gun and hit Elliott in the forehead.  Defendant directed Willis to turn on the radio.

Elliott claimed he did not have money or additional marijuana, but the robbers found more marijuana in a bucket in the garage.  After telling defendant to look for more "stuff," Quintanilla and Scott went into the house.  Scott came back into the garage holding a shotgun and an assault rifle.

Defendant left the garage, holding the bucket, followed by Quintanilla.  Then he heard a gunshot from the garage.  The robbers drove to Quintanilla's house, where defendant took some marijuana; Quintanilla and Scott kept the money and guns.

*Willis's Testimony*

Willis testified that he was with Elliott, his dealer, from early in the evening; Porter showed up later.  Willis and Elliott went into the house to watch videos with H.M. and her baby.  After bagging some marijuana, Elliott, Willis, and Porter went into the garage, where they hung out, drank beer, and smoked marijuana.

Defendant called, saying he wanted to "buy some weed"; Willis wanted to know if they could drop it off to defendant, but defendant insisted on coming to Elliott's house.  Soon after, defendant and Doughton showed up and Elliott gave them a sample.  Then men in black masks arrived and put guns to the heads of Elliott, Willis, and Porter.  Defendant told Willis not to worry.

Someone kept asking Elliott where the money was and pistol-whipped him when he said he did not have any.  Others kept running in and out of the garage.  Fifteen minutes later, Doughton shot Elliott in the back of the head and the robbers left.

*H.M.'s Testimony*

H.M. testified that early in the evening everyone was watching a movie in the house.  After the men went to the garage, she fell asleep, woke up and resumed watching the movie, then fell asleep again on the living room couch.

Hearing the door open, H.M. awoke to find someone pointing a gun at her head and ordering her to the ground.  The person went back and forth from the garage to the living room, covering his face with the hood of his sweatshirt as he asked H.M. where the money was; another man went into the bedroom.  H.M. gave the first man $140 out of her purse.  Later, she heard someone in the

3

garage say: "If somebody doesn't tell me where it is, somebody's going to get popped." Elliott answered that he didn't have anything.

*Closing arguments*

The prosecutor argued that defendant was liable for the murder and robbery of Elliott as an aider and abettor, and for the robbery of H.M. as the natural and probable consequence of the plan to do a home invasion robbery; the defendants intended from the start to "make a clean sweep" by going inside the house, and anyone there would inevitably be robbed. Defendant was also guilty of robbery in concert because the defendants together committed or aided and abetted robberies in an inhabited dwelling house; merely entering the attached garage was enough for in-concert liability as to both robberies.

Defense counsel argued that defendant "a 20-year-old kid," got trapped by the older and more hardened codefendants into going along as they committed their planned crime. He never intended to aid and abet robbery. He did not take any active part in the robbery of Elliott. He did not go into the house to rob H.M., and it was not a natural and probable consequence of anything he did, intended, or agreed to do: he did not know and could not have foreseen that H.M. would be there, let alone that she would be robbed. He was guilty only as an accessory for having taken already stolen marijuana.

The prosecutor retorted that, if under all the circumstances, a reasonable person in defendant's position would have known that the robbery of H.M. was a natural and probable consequence of the original robbery, then defendant was liable for robbing H.M. regardless of what he actually knew.

People v. Hampton, No. C056867, 2009 WL 5136012, at *1-3 (Cal. Ct. App. 3d Dist. Dec. 29, 2009) (Resp't's Lod. Doc. 1).

## III. PROCEDURAL HISTORY

After sentencing, petitioner appealed from his judgment of conviction to the California Court of Appeal for the Third Appellate District raising issues not raised in his pending amended federal habeas petition. The California Court of Appeal affirmed the judgment of conviction with the exception of remanding the case on sentencing issues with respect to the amount of the crime prevention fee imposed and clerical errors in the abstract of judgment which

/////

4

are irrelevant to these federal habeas proceedings.  Petitioner then filed a petition for review

which was summarily denied by the California Supreme Court on March 10, 2010.

Next, petitioner filed a habeas petition in the Sacramento County Superior Court

on September 22, 2010.  Therein, petitioner raised the three issues he raises in his amended

federal habeas.  The Sacramento County Superior Court denied habeas relief in a written decision

on November 4, 2010.  Petitioner's habeas petitions to the California Court of Appeal and the

California Supreme Court raising these same claims were each summarily denied on March 3,

2011 and August 31, 2011, respectively.

In February 2011, petitioner filed a federal habeas petition in this court.  Petitioner

asserted in that original petition the following:  (1) his judgment of conviction should be vacated

due to Batson/Wheeler error at trial; (2) there was insufficient evidence introduced at trial to

support his conviction; (3) his judgment of conviction should be vacated due to instructional

error (CALCRIM No. 1601); and (4) he received ineffective assistance of counsel.  Respondent

moved to dismiss the federal petition in June of 2011 arguing that the petition contained two still

unexhausted claims.  Because petitioner's exhaustion petition was still pending before the

California Supreme Court at the time his original federal petition was filed, on November 8,

2011 respondent's motion to dismiss was denied without prejudice and petitioner was directed

to file an amended petition containing all claims he wished to proceed upon in this action.  (Doc.

No. 21.)

In January of 2012 petitioner filed his amended habeas petition which is now

before the court in which he presents only the three claims he raised in his state habeas petitions.

(Doc. No. 24.)  Respondent filed an answer on May 4, 2012 and petitioner filed his traverse in

June 2012.

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for a writ of habeas corpus by a person in custody under a

judgment of a state court can be granted only for violations of the Constitution or laws of the

United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

1149 (9th Cir. 2000).

       Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the
> claim -
>
>    (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

       For purposes of applying § 2254(d)(1), "clearly established federal law" consists

of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v.

Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06

(2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at

859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  See also Clark v. Murphy,

331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding

. . . and only those precedents need be reasonably applied, we may look for guidance to circuit

precedents.")

       A state court decision is "contrary to" clearly established federal law if it applies a

rule contradicting a holding of the Supreme Court or reaches a result different from Supreme

Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640

(2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may

1  grant the writ if the state court identifies the correct governing legal principle from the Supreme

2  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1]

3  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360

4  F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

5  simply because that court concludes in its independent judgment that the relevant state-court

6  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

7  application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v.

8  Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal

9  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

10  the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

11  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

12  the state court's decision."  Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011)

13  (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

14  obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

15  ruling on the claim being presented in federal court was so lacking in justification that there was

16  an error well understood and comprehended in existing law beyond any possibility for fairminded

17  disagreement."  Harrington,131 S. Ct. at 786-87.

18           If the state court's decision does not meet the criteria set forth in § 2254(d), a

19  reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v.

20  Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

21  Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

22  of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

23  considering de novo the constitutional issues raised.").

24  _____

25           [1]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

26  384 F.3d 628, 638 (9th Cir. 2004)).

1        The court looks to the last reasoned state court decision as the basis for the state

2   court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

3   2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning

4   from a previous state court decision, this court may consider both decisions to ascertain the

5   reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

6   banc).  "When a federal claim has been presented to a state court and the state court has denied

7   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

8   of any indication or state-law procedural principles to the contrary."  Harrington, 131 S. Ct. at

9   784-85.  This presumption may be overcome by a showing "there is reason to think some other

10  explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker,

11  501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides

12  no reasoning to support its conclusion, a federal habeas court independently reviews the record to

13  determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860;

14  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is

15  not de novo review of the constitutional issue, but rather, the only method by which we can

16  determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at

17  853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

18  "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct.

19  at 784.

20        When it is clear, however, that a state court has not reached the merits of a

21  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

22  federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v.

23  /////

24  /////

25  /////

26  /////

8

Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir.

2005); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).[2]

## V.  ANALYSIS OF PETITIONER'S CLAIMS

### A.  Claim I - Ineffective Assistance of Trial Counsel

In his Claim I, petitioner asserts that his trial counsel was ineffective in handling a

witness who was possibly texting while on the witness stand at trial.  Specifically, petitioner

claims that his "attorney of record failed petitioner in that he failed to pursue a line of

questioning where he never asked one question relying entirely on witness's 'good

faith.'" (Pet'r's Am. Pet. at p. 4.)  The last reasoned state court decision addressing this claim

was from the Sacramento County Superior Court in its decision denying petitioner habeas relief.

That court addressed this claim, stating as follows:

> A petitioner seeking relief by way of habeas corpus has the burden
> of stating a prima facie case.  (In re Bower (1985) 38 Cal.3d 865,
> 872.)  A petition for writ of habeas corpus should attach as exhibits
> all reasonably available documentary evidence or affidavits
> supporting the claim.  (People v. Duvall (1995) 9 Cal.4th 464,
> 474.)  To show constitutionally inadequate assistance of counsel, a
> defendant must show that counsel's representation fell below an
> objective standard and that counsel's failure was prejudicial to the
> defendant.  (In re Alvernaz (1992) 2 Cal.4th 924, 937.)  It is not a
> court's duty to second-guess trial counsel and great deference is
> given to trial counsel's tactical decisions.  (In re Avena (1996) 12
> Cal.4th 694, 722.)  Actual prejudice must be shown, meaning that
> there is a reasonable probability that, but for the attorney's error(s),
> the result would have been different.  (Strickland v.
> Washington (1984) 466 U.S. 668, 694.)  If no prejudice is
> established, it is unnecessary to determine whether counsel's
> performance was deficient.  (In re Fields (1990) 51 Cal.3d 1063,
> 1079.)  A petition alleging ineffective assistance of counsel based
> on failure to obtain favorable evidence must show what evidence
> should or could have been obtained and what effect it would have
> had.  (People v. Geddes (1991) 1 Cal. App.4th 448, 454.)

---

[2]  The United States Supreme Court has recently granted certiorari in a case apparently to
consider this issue.  See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted
in part, ___U.S.___, 132 S. Ct. 1088 (2012).

A.  Trial Counsel

Petitioner claims that trial counsel failed to investigate whether a witness was sending or receiving text messages during her testimony and failed to ask the witness any questions in a hearing on the same matter.  First, Petitioner does not attach any transcripts of the hearing in question; consequently, there is no evidence to support the claim.  Second, although Petitioner claims that counsel should have requested that the witness's entire testimony be stricken, he does not provide any authority supporting such a request.  Petitioner has failed to show that counsel's actions were unreasonable.  Petitioner also claims that counsel should have requested that the court excuse the jurors who brought the matter to the court's attention.  However, he has not shown how the jurors were biased or otherwise disqualified.  Finally, Petitioner fails to explain how he was prejudiced by any alleged omission by trial counsel.  He has not shown that trial counsel was ineffective.

(Resp't's Lod. Doc. 8 at p. 2.)

The Sixth Amendment guarantees effective assistance of counsel.  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective assistance of counsel.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  See 466 U.S. at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The federal habeas court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the range of professional competent assistance.  Id.; Wiggins v. Smith, 539 U.S. 510, 521 (2003). "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  See also Harrington v. Richter, ___U.S. ___, ___, 131 S.Ct. 770, 787-88 (2011) ("When 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard").

10

1    Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice

2  is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

3  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

4  probability sufficient to undermine the confidence in the outcome."  Id.  See also Williams, 529

5  U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000)  "The likelihood of a

6  different result must be substantial, not just conceivable."  Harrington, 131 S.Ct. at 792.  A

7  reviewing court "need not determine whether counsel's performance was deficient before

8  examining the prejudice suffered by defendant as a result of the alleged deficiencies . . . [i]f it is

9  easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that

10  course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing

11  Strickland, 466 U.S. at 697).

12    Here, petitioner has failed to show that the Sacramento County Superior Court 's

13  order rejecting his ineffective assistance of counsel claim resulted in a decision that was contrary

14  to, or involved an unreasonable application of, clearly established federal law or resulted in a

15  decision that was based on an unreasonable determination of the facts in light of the evidence

16  presented in state court.  See 28 U.S.C. 2254(d).  The Superior Court cited the applicable

17  Strickland standard in denying petitioner habeas relief with respect to this claim.  The state court

18  determined that petitioner failed to satisfy either prong of the Strickland test.  For the reasons set

19  forth below that determination was not unreasonable.

20    A review of the state court record reveals the bailiff informed the trial judge that a

21  juror told him that he saw a witness texting on the witness stand while the judge and the

22  attorneys were at sidebar.  (See Reporter's Transcript (RT) at 308.)  Thereafter, the witness in

23  question was recalled to the stand outside the presence of the jury.  The following colloquy then

24  took place between the trial judge, the witness and the attorneys:

25        THE COURT:  I invited you back this morning because I wanted to
          ask you a question.  While the attorneys and I were talking over
26        here at sidebar there was a report that you were using your cell

11

1      phone while you were in court.

2      THE WITNESS:  In here?

3      THE COURT:  Yes.

4      THE WITNESS:  Not in here, no.

5      THE COURT:  Did you do any texting?  Did you look at your cell
       phone?
6
       THE WITNESS:  Yesterday it was off when I was in here.
7
       THE COURT:  So it was off the entire time?
8
       THE WITNESS:  Yes.
9      THE COURT:  And there was no use of the cell phone while you
       were in court?
10
       THE WITNESS:  No.
11
       THE COURT:  Mr. Saria [petitioner's trial counsel], do you have
12     any questions?

13     MR. SARIA:  No thank you.

14     THE COURT:  Mr. Gold [prosecutor]?

15     MR. GOLD:  [D]o you recall at all there was one time – there was
       an evidentiary matter where Mr. Saria and myself were talking to
16     the Judge.

17     THE WITNESS:  Yes.

18     MR. GOLD:  And you were just sitting there.  Do you recall at all
       while we were talking if at any time you may have pulled your cell
19     phone out?

20     THE WITNESS:  It was on my lap because I didn't have nowhere
       else to put it.
21
       MR. GOLD:  I'm sorry?
22
       THE WITNESS:  It was on my lap.
23
       MR. GOLD:  Did you look at it at all to see if you had received any
24     messages?

25     THE WITNESS:  I couldn't, it was turned off.

26     THE COURT:  Thank you.

1   (RT at 313-14.)

2          The record before this court indicates that the witness in question was specifically

3   questioned by the trial judge whether she was texting on her cell phone while on the witness

4   stand during petitioner's trial.  The witness stated unequivocally that she was not.  She reiterated

5   her denial when questioned further by the prosecutor.  Further questioning of the witness by

6   petitioner's trial counsel on this point was therefore unnecessary.

7          Additionally, contrary to petitioner's argument, his trial counsel did in fact avail

8   himself of the opportunity to question the witness on the issue.  In this regard, the trial judge

9   ultimately determined that the jury should be allowed to hear testimony from the witness as to

10  whether she was in fact using her cell phone to text while on the witness stand.  First, the

11  prosecutor questioned the witness in front of the jury.  Subsequently, petitioner's trial counsel,

12  Mr. Saria, cross-examined the witness in the jury's presence at which time the following

13  exchange took place:

14          Q:  So if I understand correctly, yesterday during sidebar when you
            were there, when we were over there and you were on the witness
15          stand, um, you did have your cell phone in your lap, correct?

16          A:  Yes.

17          Q:  And you had it in your hands like you do when you are texting?

18          A:  I was just holding it in one hand, yeah.

19          Q:  And were you pushing buttons?

20          A:  No.  It was closed.

21          Q:  So can you – do you have any reason why it might appear that
            you were – may have been texting?
22
23          A:  No, cause it was closed.

24  (Reporter's Tr. at p. 328.)

25          In light of this record, petitioner has failed to show that his counsel's performance

26  fell below an objective standard of reasonableness and that the denial of habeas relief on this

13

1    claim by the state court was an unreasonable application of <u>Strickland</u>.  The witness in question

2    was questioned by the trial judge and both of the attorneys on the issue of her texting while

3    seated on the witness stand and she consistently denied that she was doing so.

4           Furthermore, petitioner has failed to show that he was prejudiced by his trial

5    counsel's failure to question the witness any further on this issue.  The witness responded

6    unequivocally to the judge's and to both attorneys' questions that she was not texting.  Petitioner

7    fails to show how further questioning of the witness would have changed the outcome of the

8    proceeding to a reasonable probability.  Accordingly, the state court did not unreasonable apply

9    the <u>Strickland</u> standard nor was its decision the result of an unreasonable determination of the

10   facts.  Petitioner is therefore not entitled to federal habeas relief with respect to his ineffective

11   assistance of trial counsel claim.

12           B.  Claim II - Ineffective Assistance of Appellate Counsel

13           In his Claim II, petitioner asserts that his appellate counsel was ineffective by

14   failing to raise the alleged ineffective assistance of trial counsel argument (Claim I) on appeal.

15   The last reasoned decision addressing this issue was from the Sacramento County Superior Court

16   which denied state habeas relief on this claim, stating as follows:

17           Appellate counsel performs "properly and competently when he or
             she exercises discretion and presents only the strongest claims
18           instead of every conceivable claim."  (<u>Robbins</u>, <u>supra</u>, 18 Cal.4th at
             810.)  In the absence of a showing of some positive act of
19           misconduct, it is presumed that jurors performed their duties and
             obeyed the admonitions of the court.  (<u>People v. Eggers</u> (1947) 30
20           Cal.2d 676, 691.)

21           Petitioner's claims that he asked appellate counsel to raise the issue
             of ineffective assistance of counsel . . . but that appellate counsel
22           refused to do so.  As stated above, the claim of ineffective
             assistance of counsel is without merit.  Therefore, appellate
23           counsel was not ineffective for failing to raise that on appeal.

24   (Resp't's Lod. Doc. 8 at p. 3.)

25           The same <u>Strickland</u> standard enunciated above applies to claims that appellate

26   counsel was ineffective.  <u>Smith v. Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882

F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this context, petitioner must show that, but for appellate counsel's errors, he probably would have prevailed on appeal.  Id. at 1434 n.9.

Here, petitioner has failed to show that he was prejudiced by appellate counsel's failure to raise the issue of ineffective assistance by trial counsel (Claim I) on appeal.  Petitioner has not shown any reasonable probability that the outcome of the proceedings would have been different had his appellate counsel raised this issue on direct appeal nor could he since his Claim I is without merit for the reasons discussed above.  Accordingly, petitioner is not entitled to federal habeas relief on his claim that he received ineffective assistance from his appellate counsel.

C.  Claim III - Due Process Violated by Trial Judge's Actions

In his Claim III, petitioner asserts that the trial judge's actions and words in handling the issue of a trial witness potentially texting while on the witness stand "unlawfully inflamed the jury forming a preconceived prejudice," thereby lending credibility to the witness's entire trial testimony.  (Am. Pet. at p. 5.)  More specifically, petitioner claims that:

/////

1   during the questioning of a state's witness on whether she was
2   texting on the stand the trial court made certain opinions known to
    jurors # 10 and 12 that could easily be construed to lend credibility
3   to the witness's entire testimony thus possibly swaying these jury
    members entire opinion against petitioner.

4   (Id.)[3]

5       The last reasoned state court decision addressing this claim was the order of the

6   Sacramento County Superior Court denying petitioner habeas relief in which that court stated as

7   follows:

8       Claims that could have been raised on appeal are not cognizable on
        habeas corpus unless the petitioner can show that (1) clear and
9       fundamental constitutional error strikes at the heart of the trial
        process; (2) the court lacked fundamental jurisdiction; (3) the court
10      acted in excess of jurisdiction not requiring a redetermination of
        facts; or (4) a change in law after the appeal affected the
11      petitioner.  (In re Dixon (1953) 41 Cal.2d 756, 759; Harris, supra, 5
        Cal.4th at 828.)  Claims of ineffective assistance of counsel are
12      generally not barred by the above doctrine.  (See In re Robbins
        (1998) 18 Cal.4th 770, 814, fn. 34.)
13
14      Petitioner complains that the trial court improperly influenced the
        jury by admonishing two of the jurors.  Since the action was taken
        on the record, the issue could have been raised on appeal.
15      Therefore, the claim is barred by Dixon.

16  (Resp't's Lod. Doc. 8 at p. 1-2.)

17      Respondent argues that petitioner's Claim III is procedurally barred.  As a general

18  rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of

19  [the state] court rests on a state law ground that is independent of the federal question and

20  adequate to support the judgment."  Walker v. Martin, 562 U.S.___, ___, 131 S. Ct. 1120, 1127

21  (2011) (quoting Beard v. Kindler, 558 U.S. ___, ___, 130 S. Ct. 612, 615 (2009).  See also

22  Maples v. Thomas, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); Greenway v. Schriro, 653 F.3d

23  790, 797 (9th Cir. 2011); Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129

24  (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  Procedural default

25
26      [3]  The witness in question was Kobra Keishia Turner, who identified herself as co-
    defendant Quintanilla's girlfriend at the time of the killing.  (RT at 270-71.)

1  can only block a claim from federal habeas review if the state court, "clearly and expressly states

2  that its judgment rests on a state procedural bar." Harris, 489 U.S. at 263.  This means that the

3  state court must have specifically stated that it was denying relief on a procedural ground.  See

4  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th

5  Cir. 1993).  In order for a state procedural rule to be found independent, the state law basis for

6  the decision must not be interwoven with federal law.  Cooper v. Neven, 641 F.3d 322, 332 (9th

7  Cir. 2011); Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003); LaCrosse v. Kernan, 244 F.3d

8  702, 704 (9th Cir. 2001); Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing

9  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  To be deemed adequate, the rule must be

10 well established and consistently applied.  Walker, 131 S. Ct. at 1128; Ford v. Georgia, 498 U.S.

11 411, 424 (1991) (a state rule for these purposes is only "adequate" if it is "firmly established and

12 regularly followed");  James v. Schriro, 659 F.3d 855, 878 (9th Cir. 2011); Greenway, 653 F.3d

13 at 797-98; Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999).  Even if the state rule is

14 independent and adequate, the claims may be reviewed by the federal court if the petitioner can

15 show:  (1) cause for the default and actual prejudice as a result of the alleged violation of federal

16 law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice.

17 Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at 749-50; see also Maples,

18 132 S. Ct. at 922.

19          In denying habeas relief with respect to petitioner's Claim III the Sacramento

20 County Superior Court specifically relied on the decision in In re Dixon, 41 Cal. 2d 756 (1953).

21 (Resp't's Lod. Doc. 8 at 1-2.)  In Dixon the California Supreme Court stated that:

22          [t]he general rule is that habeas corpus cannot serve as a substitute
           for an appeal, and, in the absence of special circumstances
23          constituting an excuse for failure to employ that remedy, the writ
           will not lie where the claims errors could have been, but were not,
24          raised upon a timely appeal from the judgment of conviction.

25 41 Cal. 2d at 759.  Thus, under Dixon, a California court will not review the merits of a claim in

26 a state habeas proceeding if it could have been raised in a timely appeal but was not.

17

1     It has been determined by the Ninth Circuit that prior to 1998 the <u>Dixon</u> rule was

2 not independent of federal law.  <u>See</u> <u>Park</u>, 202 F.3d at 1152-53.  In <u>Park</u>, the court reasoned that

3 application of the <u>Dixon</u> rule necessarily was interwoven with federal law because there was a

4 fundamental constitutional error exception to the <u>Dixon</u> rule under state law.  <u>Id.</u> at 1152-53.

5 However, in <u>In re Robbins</u>, 18 Cal. 4th 770 (1998), the California Supreme Court held "that

6 henceforth California courts would no longer determine whether an error alleged in a state

7 petition constituted a federal constitutional violation."  <u>Bennett</u>, 322 F.3d at 581.  In <u>Bennett</u>, the

8 Ninth Circuit stated, "we respect the California Supreme Court's sovereign right to interpret its

9 state constitution independent of federal law" and, as a result, found that California's

10 untimeliness rule was an independent state ground.  <u>Id.</u> at 581-83.

11     Thus, under these particular circumstances, it would appear that the Sacramento

12 County Superior Court's invocation of <u>Dixon</u> in November of 2010, after <u>Robbins</u> was decided,

13 could serve as an independent state ground.  <u>Id.</u> at 582-83; <u>see also</u> <u>Park</u>, 202 F.3d at 1153 n. 4.

14 In this regard, "there [is no] existing Ninth Circuit precedent holding that the <u>Dixon</u> rule is

15 inadequate."  <u>Cree v. Sisto</u>, Civ. No. 08-487, 2011 WL 66253, at *2 (E.D. Cal. Jan 7, 2011)

16 (Kozinski, J., sitting by designation).  <u>See also</u> <u>Cantrell v. Evans</u>, No. 2:07–cv–1440, 2010 WL

17 1170063, at *13–14 (E.D. Cal. Mar. 24, 2010) (McKeown, J., sitting by designation) ("[T]he

18 procedural bar established by In re Dixon . . . . is an adequate and independent state law reason

19 for refusing to reach the merits . . . .")

20     Because the state court's reliance on <u>Dixon</u> in denying relief appears to be an

21 independent and adequate state ground, this claim would be deemed procedurally defaulted

22 unless petitioner can show cause for the default and actual prejudice as a result of the alleged

23 violation of federal law or that failure to consider the claims will result in a fundamental

24 miscarriage of justice.  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.  Petitioner states in his traverse that he

25 believed that the claim "was preserved at the in-chambers meeting even though petitioner's

26 attorney failed to present it on appeal."  (Traverse at p. 4.)  This bare assertion is insufficient to

1   demonstrate either the requisite cause and prejudice to overcome procedural default or to show

2   that this court's failure to consider the claim on the merits would result in a fundamental

3   miscarriage of justice.

4             Nevertheless, even if petitioner were to overcome the procedural default, his claim

5   that the trial judge's handling of this issue somehow violated his constitutional rights fails on the

6   merits.  "A fair trial in a fair tribunal is a basic requirement of due process."  In re Murchison,

7   349 U.S. 133, 136 (1955).  Thus, a criminal defendant is guaranteed the right to an impartial

8   judge and "[a] judge's conduct justifies a new trial if the record shows actual bias or leaves an

9   abiding impression that the jury perceived an appearance of advocacy or partiality."  United

10  States v. Marks, 530 F.3d 799, 806 (9th Cir. 2008).  To sustain a claim of judicial bias on habeas

11  corpus, however, the issue is "whether the state trial judge's behavior rendered the trial so

12  fundamentally unfair as to violate federal due process under the United States Constitution."

13  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995).[4]  The Ninth Circuit has recognized that

14  there are three general circumstances in which an appearance of bias violates due process: (1) a

15  judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against

16  one of the litigants;" (2) a judge who "becomes embroiled in a running, bitter controversy with

17  one of the litigants;" and (3) a judge who "acts as part of the accusatory process."  Crater v.

18  Galaza, 491 F.3d 1119, 1130 (9th Cir. 2007) (citing cases).  In order to prevail on a claim of

19  judicial bias, a habeas petitioner must overcome the "strong presumption that a judge is not

20  biased or prejudiced."  Sivak v. Hardison, 658 F.3d 898, 924 (9th Cir. 2011) (quoting Rhoades v.

21  Henry, 598 F.3d 511, 519 (9th Cir. 2010)).

22

23        [4]  It has been observed that "[a] trial judge's participation oversteps the bounds of
      propriety and deprives the parties of a fair trial only when 'the record discloses actual bias . . . or
24    leaves the reviewing court with an abiding impression that the judge's remarks and questioning
      of witnesses projected to the jury an appearance of advocacy or partiality.'"  United States v.
25    Parker, 241 F.3d 1114, 1119 (9th Cir. 2001) (quoting United States v. Mostella, 802 F.2d 358,
      361 (9th Cir. 1986)).  See also Duckett, 67 F.3d at 740 ("there must be an extremely high level of
26    interference by the trial judge which creates a pervasive climate of partiality and unfairness")
      (internal quotation marks and citations omitted).

1    In this case, the trial judge's actions in addressing the issue of the witnesses'

2   suspected use of a cell phone to text while she was on the witness stand did not render

3   petitioner's trial so fundamentally unfair so as to violate his due process rights.  A review of the

4   record indicates that the state trial judge's questioning of the witness in question as well as the

5   judge's questioning of jurors # 10 and # 12 did not deprive petitioner of a fair trial.  After the

6   trial judge questioned the witness about whether she had used her cell phone to send text

7   messages while on the witness stand, the trial judge then questioned the two jurors who

8   purportedly saw the witness texting.  First, the trial judge questioned juror # 10 as follows:

9        THE COURT:  Good morning.

10       JUROR NO. TEN:  Hi.

11       THE COURT:  The reason I wanted to invite you in is that you had
         reported to the Bailiff yesterday, you can sit down, if you want.
12
         JUROR NO. TEN:  Oh, thank you.
13
         THE COURT:  That you had observed Ms. Turner at least use or
14       view her cell phone in some fashion while Counsel and I were
         talking at sidebar.
15
         JUROR NO. TEN:  Uh-huh.
16
         THE COURT:  Can you tell me what you observed?
17
         JUROR NO. TEN:  She was actually at first – let me back up for a
18       moment, if I may.  One of the other jurors sort of tapped me and
         said, She is up there texting.
19
         THE COURT:  I'm sorry, I missed that.
20
         JUROR NO. TEN:  I wasn't paying attention to what was going on
21       here at the sidebar, I was looking this way.  And one of the other
         jurors tapped me and said, She is texting up there.  So I turned and
22       looked and what I saw was her down here.  I could not see the
         apparatus, but from her movements and eye movements she looked
23       like she was texting and that is why I brought it to the Bailiff's
         attention.
24
         THE COURT:  In terms of the observations that you made, did you
25       see her hands actually moving, or did you see her just viewing the
         cell phone?
26

1    JUROR NO. TEN:  I did not see the cell phone itself.

2    THE COURT:  Okay.

3    JUROR NO. TEN:  But I saw hand movements, um, from about
     here up.  I mean, I saw movements this way.

4

5    THE COURT:  Is it possible that she could have had the cell phone
     in her lap because she was holding it and maybe she was fiddling
     with it or playing with it but did not do anything else with it?

6

7    JUROR NO. TEN:  Yes, now that you mention that.  Absolutely.

8    (RT at 315-16.)

9              Next, the trial judge questioned juror # 12 as follows:

10   THE COURT:  Hi.

11   JUROR NO. TWELVE:  Hello.

12   THE COURT:  The reason I invited you in is that there was a
     report that when Counsel and I were talking at sidebar yesterday

13   that Ms. Turner may have been viewing her cell phone.

14   JUROR NO. TWELVE:  Uh-huh.

15   THE COURT:  Did you observe that?

16   JUROR NO. TWELVE:  Yes, I did.

17   THE COURT:  What did you observe?

18   JUROR NO. TWELVE:  I observed her looking down and texting,
     using her fingers, and then she would look up and look around and

19   look down again and started texting again.

20   THE COURT:  How do you know she was texting?

21   JUROR NO. TWELVE:  Well, it looked like her fingers were
     moving the way her arms were.

22

23   THE COURT:  Is it possible she was looking at the cell phone
     maybe because she had nowhere else to put it and fiddling with it?

24   JUROR NO. TWELVE:  She could have been.  When she first

25

26

                                    21

went up on the witness stand she sat it right on top of the thing.[5]  I thought she would lay it there and leave it alone.

. . . .

THE COURT:  . . . . Did you report that to anyone else?

JUROR NO. TWELVE:  She just said, Did you see that [sic], and I said, Yes, I did [sic].

THE COURT:  Did you talk to any other jurors about it?

JUROR NO. TWELVE:  No.

THE COURT:  I will invite (Redacted, Juror No. ten) back in for a moment.  You can go ahead and have a seat again.

Welcome back.

JUROR NO. TEN:  Thank you.

THE COURT:  And I guess the one question I didn't ask you . . . did you discuss the matter with anyone else other than (Redacted, Juror No. Twelve)?

JUROR NO. TEN:  No.

THE COURT:  No other jurors?

JUROR NO. TEN:  No.

THE COURT:  Okay.  I'm going to advise both of you that it appears that Ms. Turner simply had the cell phone because she had nowhere else to place it.  It does not appear she was texting from everything we have been able to discover.  So I'm going to ask you both to simply disregard the appearance of her with that cell phone and not take it into account in any fashion.  All right.  I will have you both step outside and we will invite you all back in in a moment.

(RT at 317-19.)

        After further discussion between the court and the attorneys, the trial judge

determined that the testimony of the witness regarding whether she was texting while on the

_____

        [5]  If juror No. 12's testimony in this regard is accurate, it is troubling that a witness was allowed to take the stand at trial, openly displaying their cell phone and setting it down on the stand.  However disconcerting that scenario may be, it plays no role in the court's consideration of the constitutional issues raised by petitioner in his amended federal habeas petition.

witness stand should be heard by the entire jury.  (RT 320-23.)  Accordingly, the trial judge then

called back jurors # 10 and # 12 and explained to them the following:

> The reason I have invited you back in is I had told you a little bit
> ago that you were to disregard anything you saw with regard to Ms.
> Turner and the cell phone.  [¶]  What I'm going to tell you now is
> that we are going to recall Ms. Turner to the witness stand and the
> attorneys are going to have a chance to ask her about that exact
> incident.  And so, therefore, there will be testimony on this matter.
> Obviously because it's now going to be testimonial in nature you
> can consider anything that you hear from the witness during this
> proceeding.

(Id. at 323.)  Thereafter, both the prosecutor and petitioner's trial counsel questioned the witness

in the entire jury's presence about whether she had been texting on her cell phone while on the

stand.  (Id. at 326-28.)

       This record indicates that the trial judge's actions did not deprive petitioner of his

due process rights.  When initially presented with the possibility that members of the jury saw a

witness texting while on the witness stand, the trial judge questioned the witness outside the

presence of the entire jury.  The witness responded to the trial judge's inquiries that she was not

texting.  Thereafter, the trial judge questioned the two jurors who had reported the incident to the

bailiff.  The trial judge initially determined based on the testimony that the witness was not

texting and any suggestion that she was should be disregarded by the reporting jurors.  However,

the trial judge subsequently changed course and allowed the entire jury to hear testimony from

the witness regarding whether she was in fact texting while on the witness stand.  He specifically

instructed the two jurors who had reported their observations that, contrary to his initial

admonition, they could now consider the witnesses' testimony regarding the issue of her cell

phone use on the witness stand.

       Under these circumstances, the actions of the trial judge in addressing this issue

did not render petitioner's trial fundamentally unfair.  There is no evidence to suggest that the

trial judge's remarks could have left the jury with an impression of partiality on his part,

particularly in light of the facts as they were presented to him.  Moreover, there is no abiding

23

1    impression left by this record that the trial judge's remarks and questioning of witnesses

2    projected to the jury an appearance of advocacy or partiality.  Petitioner's has failed to

3    demonstrate that the trial judge created a pervasive climate of partiality and unfairness in

4    handling this issue.

5          Therefore, petitioner is not entitled to federal habeas relief on his claim that the

6    trial judge's actions denied him his right to due process.

7                          CONCLUSION

8          Accordingly, for the reasons set forth above, IT IS HEREBY RECOMMENDED

9    that petitioner's amended petition for writ of habeas corpus be DENIED.

10          These findings and recommendations are submitted to the United States District

11    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

12    one days after being served with these findings and recommendations, any party may file written

13    objections with the court and serve a copy on all parties.  Such a document should be captioned

14    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15    shall be served and filed within fourteen days after service of the objections.  The parties are

16    advised that failure to file objections within the specified time may waive the right to appeal the

17    District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>,

18    951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of

19    appealability should issue in the event he files an appeal of the judgment in this case.  <u>See</u> Rule

20    11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

21    certificate of appealability when it enters a final order adverse to the applicant).

22    DATED: September 5, 2012.

23

24                              _Dale A. Drozd_

                                 DALE A. DROZD

25    DAD:dpw                  UNITED STATES MAGISTRATE JUDGE

     hamp0541.157

26